UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| KEITH CHAMBERLAIN , | Case No. 3:14-cv-05103 |
| Plaintiff, | |
| vs. | **COMPLAINT FOR DAMAGES** |
| THE SYGMA NETWORK, INC., | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

## I.     INTRODUCTION

1.1     Plaintiff Keith Chamberlain ("Chamberlain" or "Plaintiff") requests damages and attorneys' fees and costs for the wrongful conduct of The Sygma Network Inc. ("Sygma" or "Defendant").  Defendant harassed Plaintiff, retaliated against Plaintiff, and wrongfully terminated Plaintiff for illegal and discriminatory reasons causing severe damages.

//

//

COMPLAINT FOR DAMAGES - 1

HKM EMPLOYMENT ATTORNEYS LLP
1325 Fourth Ave., Suite 540
Seattle, Washington  98101
(206) 838-2504

## II. JURISDICTION AND VENUE

2.1  This Court has jurisdiction over this action pursuant to 28 U.S.C § 1332.

2.2  Defendant is a citizen of the state of Delaware, with its principle place of business located in Dublin, Ohio.  Plaintiff is a resident of the state of Washington.

2.3  This action has been filed within the applicable statutory time periods.

2.4  Venue is proper in this Court.

## III. PARTIES

3.1  Plaintiff resides in Vancouver, Washington.  Plaintiff was employed by Defendant in Clackamas, Oregon during the relevant time period.

3.2  Defendant is a duly registered and licensed Delaware corporation that transacts business throughout the United States and has its principal place of business in Dublin, Ohio.

## IV. FACTS

4.1  Operating from 17 distribution centers, Sygma is one of the largest chain distributors in the United States with sales over $5 billion.  According to its website, "an outstanding team of over 2,800 associates supports the delivery of over 150 million cases of product per year, driving 400 million miles."

4.2  For approximately nineteen years, Chamberlain was a member of the outstanding team supporting the delivery of quality food and non-food products for Sygma.

4.3  In 1994, Chamberlain began his illustrious career at Sygma as a route driver.  Despite the long hours and manual labor, Chamberlain genuinely loved his job.  He was

excited at what his future would hold at Sygma and was eager to embrace every new opportunity.

4.4 In 1997, Sygma hired Dave Simmons ("Simmons"). Simmons was hired to supervise several route drivers, including Chamberlain.

4.5 Simmons quickly identified himself as an Evangelical Christian in the workplace. He repeatedly told his co-workers and subordinates that he felt an "extreme dislike toward the gays."

4.6 Chamberlain, an ordained Christian minister himself, tried to be respectful of Simmons' views even though he was gay and Simmons' words greatly hurt him. Chamberlain tried to keep a safe distance from Simmons and refrained from speaking to him about anything personal.

4.7 Shortly after starting his employment at Sygma, Simmons discovered that Chamberlain was gay and "masquerading" as a Christian. Simmons was infuriated. He began referring to Chamberlain as a "homosexual." He portrayed Chamberlain as nothing more than a "queer" and a "religious nut." Simmons could not reconcile Chamberlain's religious and sexual identities and it fueled his rage toward Chamberlain.

4.8 In an attempt to push Chamberlain out of the company, Simmons endeavored to create a hostile and discriminatory work environment targeting Chamberlain's sexual orientation and religious affiliations. As part of that campaign, Simmons engaged in the following conduct:

- Simmons told employees that Chamberlain was gay and to "watch out;"

- Simmons told employees not to speak with Chamberlain because "he had a target on his back;"

- Simmons instructed Chamberlain's co-workers to be "on the lookout" for reasons to terminate his employment;

- Simmons asked Chamberlain's co-workers to "spy" on him;

- Simmons constantly told co-workers that Chamberlain was "weak" and a "weenie;"

- During Sunday Quarterly Safety Meetings, Simmons openly mocked Chamberlain for "attending church;"

- Simmons would roll his eyes, ignore Chamberlain, or mock him in group settings;

- Simmons singled Chamberlain out on load requirements and time reports in an effort to decrease his bonuses and further marginalize him;

- Simmons suspended Chamberlain for erroneous performance reasons. Chamberlain was performing as well, if not better, than his co-workers and none of them were suspended;

- Simmons told Chamberlain's co-workers that he wanted to fire Chamberlain but that "he didn't want to get sued."

4.9     Chamberlain repeatedly complained to Human Resources about Simmons' inappropriate and targeting behavior for years. First, he complained to Sharon Fontaine ("Fontaine") in Human Resources. She did her best to stop Simmons' unrelenting behavior and inappropriate conduct. At some point, however, she was unable to keep Simmons' at bay. She apologetically told Chamberlain that she could not stop Simmons and that "she had

COMPLAINT FOR DAMAGES - 4

to keep a job as well." When Fontaine left Sygma, Chamberlin tried to seek help from Jaime Beltz ("Beltz"), another Human Resources employee. He similarly spoke with Mike Miller, Heather Peyton, and Pat Eberly about these ongoing issues.

4.10    On one occasion, Chamberlain spoke with Beltz about Simmons' aggressive and demeaning attitude toward Chamberlain. During that conversation, Chamberlain told Beltz that he could not understand why Simmons hated him so much in light of the fact that Simmons had a lesbian daughter. Chamberlain told Beltz that neither he nor Simmons' daughter chose to be gay and that neither of them could change to make Simmons' happy. Beltz appeared to sympathize with Chamberlain but was unable to help him.

4.11    Instead of trying to help Chamberlain, by speaking to Simmons about his inappropriate and illegal behavior, Beltz informed Simmons that Chamberlain had talked to her about his concerns. Simmons was furious. Soon after, Simmons verbally attacked Chamberlain. Chamberlain was terrified and feared that Simmons would physically assault him. While Simmons did not physically assault Chamberlain, he retaliated against him by refusing to allow him to alter his turnaround times while his loads continued to worsen. Mysteriously, Chamberlain's loads became even more discombobulated throughout this period.

4.12    For thirteen years, Simmons endeavored to make Chamberlain's life a living hell at work. Chamberlain's loads were constantly stacked improperly, and he was given less time to meet his drops than any other similarly situated employee. Every time Chamberlain complained about this disparate treatment, the treatment worsened. On one occasion,

COMPLAINT FOR DAMAGES - 5

Simmons called Chamberlain a "liar" and other occasions he told Chamberlain "why don't you just quit."

4.13   Throughout his tenure under Simmons, Chamberlain was made to suffer several erroneous write-ups and suspensions, denials of bonuses, and outright refusals of transfers.  When Chamberlain requested vacation time during the holidays, he was denied.  When Chamberlain requested a helper after having an emergency appendectomy, he was denied.  The more Chamberlain struggled, the more pleasure Simmons derived.

4.14   Sygma encouraged a hostile and abusive work environment.  Simmons' hatred toward Chamberlain was palpable.  Several employees stopped speaking with Chamberlain or even acknowledging his presence at work.  Those that sympathized with his situation told Chamberlain to complain about his poor treatment.  Every time Chamberlain tried to ask for help, his situation worsened.  Chamberlain, who was then only one year from reaching the company's first retirement qualification mark, decided it was best to remain quiet and carry on.

4.15   Chamberlin suffered for over thirteen years as a result of the discrimination and harassment he endured by Simmons at Sygma.  On October 15, 2013, after nineteen years of dedicated service and several complaints to management about Simmons, Sygma fired Chamberlain.

//

//

//

## V. CAUSES OF ACTION

5.1 Plaintiff realleges paragraphs 1.1 through 4.15 of the Complaint and hereby incorporates the same by reference.

5.2 The above facts state claims against Defendant for sexual orientation discrimination, in violation of RCW 49.60 *et. seq.*, the Washington Law Against Discrimination.

5.3 The above facts state claims against Defendant for religious discrimination, in violation of RCW 49.60 *et. seq.*, the Washington Law Against Discrimination.

5.4 The above facts state claims against Defendant for retaliation, in violation of RCW 49.60 *et. seq.*, the Washington Law Against Discrimination.

5.5 The above facts state claims against Defendant for creating and maintaining a hostile work environment, in violation of RCW 49.60 *et. seq.*, the Washington Law Against Discrimination.

## VI. PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for relief as follows:

A. Damages for back pay, front pay, lost benefits, and medical expenses in an amount to be proved at trial;

B. Damages for loss of enjoyment of life, pain and suffering, mental anguish, emotional distress, and humiliation;

C. Prejudgment interest in an amount to be proved at trial;

D. Compensation for any tax penalty associated with a recovery;

E. Reasonable attorneys' fees and costs;

F. Statutory punitive damages; and

G. Whatever further and additional relief the court shall deem just and equitable.

Respectfully submitted this 5th day of February, 2014.

                **HKM EMPLOYMENT ATTORNEYS LLP**

                *s/ Lisa A. Burke*
                LISA A. BURKE, WSBA #42859
                **HKM EMPLOYMENT ATTORNEYS LLP**
                1325 Fourth Avenue, Suite 540
                Seattle, WA 98101
                Telephone: 206-838-2504
                Fax: 206-260-3055
                E-mail: lburke@hkm.com
                *Attorneys for Keith Chamberlain*